IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| KATHRYN ELIZABETH CAMPBELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 6:13-CV-00026 |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Kathryn Elizabeth Campbell ("Campbell") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore not eligible for supplemental security income ("SSI") and disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383f. Specifically, Campbell alleges that the Administrative Law Judge ("ALJ") erroneously found that Campbell did not meet or medically equal a listed impairment and improperly discredited her testimony. I conclude that substantial evidence supports the ALJ's decision on both grounds. Accordingly, I **RECOMMEND DENYING** Campbell's Motion for Summary Judgment (Dkt. No. 15), and **GRANTING** the Commissioner's Motion for Summary Judgment. Dkt. No. 19.

## STANDARD OF REVIEW

This Court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Campbell failed to demonstrate that she was

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is hereby substituted for Michael J. Astrue as the defendant in this suit.

1

disabled under the Act.[2] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Campbell protectively filed for SSI and DIB on January 30, 2009, claiming that her disability began on December 1, 2008. R. 12. The Commissioner denied the application at the initial and reconsideration levels of administrative review. R. 12, 103–12, 115–20. On October 12, 2011, ALJ Geraldine H. Page held a hearing to consider Campbell's disability claim. R. 28–52. Campbell was represented by an attorney at the hearing, which included testimony from Campbell and vocational expert John F. Newman. R. 28–52.

On October 26, 2011, the ALJ entered her decision analyzing Campbell's claim under the familiar five-step process[3] and denying her claims for benefits. R. 9–23. The ALJ found that

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

2

Campbell suffered from the severe impairments of status-post closure of lipomyelomeningocele (a fatty tumor located on the spinal cord) and treatment of lipoma at 4 months old; obesity; degenerative disc disease of the lumbosacral spine; and left knee joint effusion. R. 14–15. The ALJ found that these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 16. The ALJ further found that Campbell retained the RFC to perform a range of sedentary work, with the following additional limitations:

> Specifically, the claimant can lift and/or carry 10 pounds frequently and occasionally; can stand and/or walk for up to two hours and sit for up to six hours in an eight-hour workday; requires the opportunity to change posture between sitting and standing every hour, briefly and in place without leaving the workstations; can never crawl; can occasionally climb ramps and stairs, balance, kneel, stoop, and crouch; and should avoid exposure to hazardous machinery, unprotected heights, working on vibrating surfaces, or climbing ladders, ropes, or scaffolds.

R. 16. The ALJ determined that Campbell could not return to her past relevant work as a food service worker, housekeeper, personal care attendant, cashier, and shift manager (R. 22), but that Campbell could work at jobs that exist in significant numbers in the national economy: namely packer, inspector, tester, assembler, and sorter. R. 23. Thus, the ALJ concluded that she was not disabled. R. 23. On February 6, 2013, the Appeals Council denied Campbell's request for review (R. 1–4), and this appeal followed.

## **ANALYSIS**

Campbell asserts that the ALJ's decision is not supported by substantial evidence for two reasons. First, Campbell contends that the ALJ's analysis was flawed with regard to whether Campbell met or medically equaled the listing for a musculoskeletal impairment. Second, Campbell asserts that the ALJ improperly discredited his testimony using boilerplate language.

**Listing**

Campbell argues that she is disabled, and thereby eligible for benefits, because she suffers from a back impairment which qualifies as a "disorder of the spine" under Musculoskeletal Listing 1.04. The ALJ considered Listing 1.04 in her analysis, but determined that Campbell did not meet or medically equal the requirements of Listing 1.04. R. 16. Specifically, the ALJ noted that "[t]he current evidence…fails to establish an impairment that is accompanied by signs that are reflective of listing-level severity. Also, none of the claimant's treating or examining physicians of record has reported any of the necessary clinical, laboratory, or radiographic findings specified therein." R. 16. I find that while Campbell suffers from a significant back impairment, substantial evidence supports the ALJ's conclusion that her condition does not meet or medically equal the listing so as to automatically result in a finding of disability at step three of the sequential analysis.

A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). "When satisfied, the listings of impairments automatically result in a finding of disability. The listings are designed to reflect impairments that, for the most part, 'are permanent or expected to result in death.'" Casillas v. Astrue, 3:09-CV-00076, 2011 WL 450426, at *4 (W.D. Va. Feb. 3, 2011) (citing 20 C.F.R. § 404.1525(c)(4)). It is well settled that Campbell must establish that she meets all of the requirements of a listing. Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

Listing 1.04(A) for disorders of the spine requires proof of the following:

**1.04 Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:

4

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)
>
> OR
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> OR
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.04. All listings for musculoskeletal impairments, including Listing 1.04, require a showing of loss of function which impacts a claimant's ability to engage in competitive employment. The Social Security Administration defines loss of function as follows:

> Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone.

20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(a). The regulations further define the "inability to ambulate effectively" as an "extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(b)(1). This

5

generally means that a claimant is unable to independently ambulate without the use of assistive devices such as a walker or two canes. Id. An "inability to perform fine and gross movements effectively" is further defined as "extreme loss of function of both upper extremities" that similarly interferes with a claimant's ability to work by reaching, pushing, pulling, grasping, and fingering. 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(c). Examples of an inability to perform fine and gross movements effectively include things like being unable to prepare a simple meal, feed oneself, or take care of personal hygiene. Id.

Campbell had a procedure shortly after birth to remove a fatty tumor on her lower spine. (R. 31, 321–29). The tumor apparently returned later in life, causing her pain which makes it difficult to stand for extended periods. R 292. At the time of Campbell's alleged onset of disability on December 1, 2008, she was under the care of Kenneth B. Perkins, P.A., of UVA Middlebrook Family Medicine. On December 5, 2008, Campbell saw Mr. Perkins for chronic back pain. R. 294. Mr. Perkins noted that a prior x-ray identified a posterior spinal defect and calcification of posterior soft tissue. On physical examination, Mr. Perkins found Campbell's L4 and L5 region of her lumbar spine to be "exquisitely tender to palpitation as is the whole lumbar spine." Campbell had a negative straight leg raise test bilaterally and good strength in her lower extremities. Mr. Perkins ordered an MRI and referred Campbell to a neurosurgeon at UVA.

An MRI of Campbell's spine on December 15, 2008 showed normal alignment but spina bifida at L5 and S1, and that the spinal cord was "low lying and tethered with the end near L5-S1." R. 306. The MRI also revealed a large amount of fat in the lower lumbar and upper sacral regions, and that fat in the posterior portion of the cord starting at L3 was caused severe tethering. Campbell's spinal cord was thinned to one or two millimeters in its anterior and lateral aspect. In addition, imaging showed degenerative disc disease, a disc bulge at T10-11 abutting the anterior surface of the cord, and a small disc herniation at L1-2. These findings were

6

consistent with lipomyelomeningocele. At a follow up visit to Mr. Perkins, Campbell again exhibited pain on palpitation, although she again had a negative straight leg raise test. R. 292.

On January 22, 2009, Campbell sought consultation from John A. Jane, Sr., M.D., a neurosurgeon at the University of Virginia. R. 266. After evaluating Campbell, Dr. Jane did not find surgical intervention appropriate, and stated only that he would follow her on an as needed basis. R. 290, 301. Indeed, Dr. Jane told Campbell that surgery could actually make her condition worse and would like to hold off on surgery as long as possible. R. 290. Dr. Jane stated that work would continue to exacerbate Campbell's pain and recommended that she think about applying for disability. R. 290.

At a visit to Mr. Perkins on February 5, 2009, Campbell reported that prolonged periods of time on her feet causes pain to radiate down her left leg. R. 290. As a result of the discomfort, Campbell had to cut back on work. Mr. Perkins continued Campbell on her medications, which included Daypro, Vicodin, Valium, and Darvocet. In April 2009, Campbell continued to be tender in her lumbar region, but her muscle strength in her lower legs was intact and equal bilaterally. R. 286, 288. Mr. Perkins also described her lipomyelomeningocele as stable. R. 288. On May 28, 2009, Campbell reported that she still needed to use Vicodin up to four times a day, and that she had difficulty bending, lifting, and stooping. R. 283. Campbell also stated that she had left knee pain. Campbell reported that the knee pain stems from an incident in 2004 where her knee gave way, but that x-rays of the knee were normal at that time. Mr. Perkins found her patella region tender and some anterior cruciate ligament (ACL) laxity, but no effusion, joint line tenderness, and equal muscle strength. Mr. Perkins noted no change in Campbell's chronic back pain.

At a follow up visit with Mr. Perkins in August 2009, Campbell continued to have tenderness in her lumbar region, as well as a small effusion in her left knee. R. 281. Campbell's

7

knee ligaments were intact but there was some subpatellar tenderness. On October 8, 2009, Campbell reported instability in her left knee, particularly when she carried her daughter. R. 279. On October 8, 2009, Mr. Perkins observed a large effusion in the knee, tenderness of the medial and lateral joint line, and laxity of the medial collateral ligament (MCL). Mr. Perkins suspected a meniscal tear with a MCL strain or partial tear. An x-ray of Campbell's left knee on October 3, 2009 was normal (R. 305) and an MRI of her left knee taken on October 16, 2009 showed a small joint effusion, but no evidence of internal derangement. R. 304-305.

Several months later, on April 6, 2010, Campbell again saw Mr. Perkins for complaints of back pain and left knee pain. R. 314. Mr. Perkins noted Campbell remained tender in her lumbar region with radiation into her buttocks on both sides. As to her knee, Mr. Perkins observed moderate effusion and pain to the medial and lateral joint line. Mr. Perkins recommended water-based physical therapy and continued Campbell on Vicodin.

The record contains several opinions of functionality from medical sources. Two are from Campbell's family care provider, Mr. Perkins, a physician's assistant. On April 7, 2010, Mr. Perkins wrote to the Social Security Administration that Campbell was limited in her ability to stand or walk, that she could not sit more than two hours without the opportunity to lie down and stretch, and that she was unable to stand greater than one hour at a time without having to sit or lie down. R. 313. Mr. Perkins further noted that Campbell has instability in her knee, which occasionally required use of a cane to assist walking. Mr. Perkins stated that Campbell could not perform work activities on a consistent basis, and that due to her pain medication, placing her in hazardous conditions would not be advised. Mr. Perkins also wrote that Campbell would unlikely be able to maintain a work schedule without interruption.

Mr. Perkins also filled out a physical RFC questionnaire on August 5, 2011. R. 330–34. Mr. Perkins diagnosed Campbell with degenerative joint disease and degenerative disc disease of

the lumbar, thoracic, and cervical spine. R. 330. In addition to back and knee pain that increased with activity, Mr. Perkins noted that these conditions caused left flank numbness, weakness, and tremors. Clinical findings and objective signs of Campbell's symptoms were decreased range of motion and decreased strength. Mr. Perkins noted that Campbell's pain and other symptoms would constantly interfere with her attention and concentration. R. 331.

Mr. Perkins gave the opinion that in a competitive work situation, Campbell would be able to walk less than one city block without rest or severe pain; sit 45 minutes at one time, but must change positions frequently; stand for 45 minutes at a time; sit, stand, and walk for a total of less than two hours in an eight hour workday; require two-minute walking breaks every 30 minutes, as well as unscheduled breaks; require lying down frequently; and require a cane or other assistive device while standing or walking. R. 331–32. Additionally, Mr. Perkins found that Campbell could only occasionally lift and carry less than 10 pounds and rarely lift 10 pounds; and never twist, stoop, crouch/squat, climb ladders, or climb stairs. R. 333. Mr. Perkins also determined that Campbell could use his right arm, hand, and fingers 50 percent of a workday, but could use his left arm, hand, and fingers only 15 percent of a workday. Finally, Mr. Perkins concluded that Campbell would have "good days" and "bad days," and that Campbell would be absent from work more than four days per week due to her symptoms. R. 333.

On two occasions, state agency physicians reviewed Campbell's file and assessed her RFC. The first of these assessments was performed by Brian Strain, M.D., on September 30, 2009. R. 58–59. Dr. Strain found that Campbell did not meet the requirements of Listing 1.04 for disorders of the spine. R. 57. Dr. Strain found that, from an exertional standpoint, Campbell was limited to occasionally lifting and/or carrying 10 pounds; frequently lifting and/or carrying 10 pounds; standing and/or walking with normal breaks for a total of two hours; sitting for about six hours in an eight-hour workday; and unlimited ability to push and/or pull beyond these other

9

Case 6:13-cv-00026-NKM-RSB Document 23 Filed 07/28/14 Page 9 of 18 Pageid#: 423

limitations. R. 58. As far as postural limitations, Dr. Strain found Campbell limited to occasionally climbing ramps/stairs, balancing, stooping, kneeling, and crouching; and never able to crawl or climb ladders, ropes, or scaffolds. R. 58. Furthermore, Dr. Strain determined that Campbell had no manipulative, visual, communicative, or environmental limitations, other than that she should avoid hazards such as machinery and heights. R. 58–59.

On April 16, 2010, Richard Surrusco, M.D. evaluated Campbell's file on reconsideration, which included Mr. Perkins' 2010 opinion. R. 82–84. Dr. Surrusco affirmed Dr. Strain's assessment of Campbell's ability to work, arriving at an identical physical RFC.

In a function report filled out by Campbell in May 2009, Campbell detailed the daily activities she was capable of performing during the relevant period. R. 219–26. Campbell stated that she was able to care for her daughter, including feeding, changing, and bathing her. R. 220. Campbell reported that she had no difficulty dressing and feeding herself, but had difficulty bending down when bathing or shaving. R. 220. About once a month, Campbell prepares a meal, but her husband does most of the cooking in the household. R. 221. Campbell stated that she was capable of doing the dishes, dusting, and vacuuming, although she required breaks. R. 221. Campbell indicated that she went outside at least once a day and that she was able to drive a car. R. 222. Campbell stated that she was able to go shopping in stores about twice a month, and that the shopping trips take most of the day. R. 222. Campbell reported reading a lot and visiting with friends once a week. R. 223. Campbell stated that due to her back condition, she has difficulty walking and lifting things, and that she can't play with her daughter more than 20 minutes at a time. R. 224.

At the administrative hearing on October 12, 2011, Campbell testified that she last worked as a cashier in March 2009, and that she stopped working because she couldn't stand for more than 30 minutes without having back pain. R. 33. Campbell stated that standing causes

10

extensive bruising and swelling on her back on a daily basis, and that "[v]ery seldom is there not a bruise across my back." R. 42–43. Until she left work, Campbell testified she worked an average of less than 30 hours a week. R. 33–34. Campbell stated that she had twice fallen in her home due to swelling and numbness in her leg. R. 37, 44. Campbell testified that she could not sit long before having to change positions, and that she estimated she could lift about ten pounds. R. 38. Campbell reported using a cane at the suggestion of her doctor every "once in a while" when her left side was acting up. R. 38. Additionally, Campbell stated she had occasional pain in her arm and knee, as well as migraines. R. 38, 40–41. Her pain medication at the time of the hearing was hydrocodone, which did not cause any side effects. R. 39.

Campbell reported at the hearing that she was able to do chores like wash dishes, dust, and vacuum, but that it took her all day to do these things. R. 40. She did them "periodically" because she has to "lay down so many times during the day," and that her husband sometimes assists with the chores. R. 40. Campbell reported that she spent 50 to 80 percent of her days laying down. R. 42. Campbell stated that when she goes shopping she has to take breaks and sit down. R. 42. Campbell testified that she could not lift her three year old daughter and that her family helps care for the daughter. R. 41–42.

Based on this record, there is substantial evidence to support the ALJ's decision the Campbell did not meet or medically equal the requirements of Listing 1.04. While Campbell's brief does not specify which section of the listing she argues she satisfies, at oral argument Campbell argued that section 1.04(C) was the most appropriate.[4] Listing 1.04(C) requires proof of a disorder that results in *both* the "compromise of a nerve root…or the spinal cord" as well as "[l]umbar spinal stenosis resulting in pseudoclaudification established by findings on appropriate

---

[4] Campbell does not contend that she suffers from nerve root compression or spinal arachnoiditis, thereby precluding her from meeting Listings 1.04(A) or 1.04(B).

medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.04(C); see also Lehman v. Astrue, 931 F. Supp. 2d 682, 689 (D. Md. 2013).

As an initial matter, there is a dispute between the parties as to whether there exists any clinical, laboratory, or radiographic findings indicating compromise of a nerve root or spinal cord as required by Listing 1.04. The December 2008 MRI of Campbell's back showed that her spinal cord was "low lying and tethered with the end near L5-S1," was thinned by 1 or 2 millimeters in its anterior and lateral aspect, and that a disc bulge at T10-11 abutted the anterior surface of her spinal cord. R. 306. It thus appears to the Court that this imaging indicates at least some spinal cord compromise, contrary to the suggestion by the ALJ in her decision. R. 16. Problematic though, is that while the medical record demonstrates other back conditions, it is not apparent that Campbell suffered from lumbar spinal stenosis (the narrowing of space in the spine resulting in pressure on the spinal cord) as required by Listing 1.04(C). Campbell's primary diagnosis based on the 2008 MRI was lipomyelomeningocele, evidenced by the presence of fat and tethering of the spinal cord. R. 306.

Even assuming that the other requirements of the listing are met, I find that sufficient evidence supports the ALJ's finding that Campbell lacked a listing-level loss of function. In particular, Campbell has not met her burden of establishing that her back condition resulted in an inability to ambulate effectively as required by Listing 1.04(C). The standards defining an "inability to ambulate effectively" are, consistent with the purpose and function of the listings, stringent:

> examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at

12

> a reasonable pace with the use of a single hand rail. The ability to walk
> independently about one's home without the use of assistive devices does not, in
> and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 1.00(B)(2)(b)(2).

While Campbell's primary care provider, Mr. Perkins, suggested that Campbell may occasionally require the use of a cane, this was due to Campbell's knee pain, and not her back condition. R. 313. Further, although Mr. Perkins may have suggested the use of a cane, Campbell was never prescribed a walker or cane and admitted only using a cane every "once and a while" when her left side was "acting up." R. 38. Campbell does not require a walker or two crutches, as suggested by the regulatory definition above, and Campbell's occasional use of one cane is insufficient evidence of an inability to ambulate effectively. See McAuley v. Colvin, 7:12-CV-311-D, 2013 WL 7098724, at *9 n.15 (E.D.N.C. Dec. 13, 2013) (claimant's use of single cane "does not bring him within the ambit of 1.04(c)").

Campbell's reported daily activities also do not suggest listing-level functional loss that precludes her from performing any gainful activity. One problematic aspect to Campbell's argument that she was per se disabled under the listings was that she continued to work well past her alleged onset date of disability. See, e.g., Childers v. Astrue, 1:09CV225, 2012 WL 1267897, at *10 (M.D.N.C. Apr. 16, 2012) ("Plaintiff's continued work ... long after her alleged onset date, documented throughout the record ... represents the most significant evidentiary conflict."). Although Campbell alleges that her listing-level disability began December 1, 2008, the record reflects that she continued to work eight-hour days, three days a week at a fast food restaurant into the spring of 2009. R. 33–34, 202–03. It is unlikely that an individual with impairments at the listing level would be able to travel to work this regularly and perform this level of activity.

Campbell's statements in function reports and at the administrative hearing also do not support a finding that she suffered from listing-level functional loss. Campbell was able to,

13

among other daily activities, provide basic care for her three year old daughter, perform household chores, go outside daily, drive a car, go shopping, and visit with friends. R. 40–43. 220–24. While some of Campbell's other statements suggest more debilitating functional loss, the ALJ was entitled to weigh these statements against the other evidence of record and find her only partially credible, as discussed more fully below.

Finally, no opinion from an acceptable medical source suggested that Campbell's back impairment was so severe as to meet the requirements of Listing 1.04.[5] Both state agency physicians found Campbell capable of performing a range of sedentary work. R. 58–59, 82–83. Even the restrictive assessments determined by Mr. Perkins are undermined by Campbell's largely conservative course of treatment, as noted by the ALJ. Dr. Jane, a neurosurgeon, determined that surgical intervention was not appropriate. R. 290, 301. Mr. Perkins managed Campbell's condition with pain medication and suggested physical therapy, which it appears from the record Campbell did not pursue. R. 314.

A claimant who suffers from an impairment which meets only some of the criteria of a listing, no matter how severe, does not qualify as being disabled under the listing. <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990). Here, although the record demonstrates that Campbell suffers from a significant back impairment, she does not meet the stringent requirements of the listing regarding functional loss. I find that substantial evidence supports the ALJ's decision, and therefore, I must affirm the ALJ's decision on this ground.

## <u>Credibility</u>

Campbell next argues that the ALJ improperly analyzed the credibility of her statements concerning the severity of her symptoms. Specifically, Campbell asserts that the ALJ used

---

[5] The opinions most helpful to Campbell in the record are from Mr. Perkins, a physician assistant who is not considered an acceptable medical source. 20 C.F.R. § 416.913(a)

boilerplate language to discredit her without accurately reviewing the evidence of her symptoms. The ALJ found that Campbell's allegations of physical symptoms were partially credible, and that "[b]ased on the objective findings and medical imaging in the record, the undersigned find the claimant's pain and other physical symptoms would limit her only to the extent reflected in the above residual functional capacity." R. 19. The ALJ specifically noted that Campbell's complaints of frequent leg numbness and constant bruising and swelling in the back were not supported by the medical record. I find that substantial evidence supports the ALJ's credibility analysis.

The ALJ determines the facts and resolves inconsistencies between a claimant's alleged impairments and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Campbell's subjective complaints of disabling symptoms are not conclusive. Rather, the ALJ must examine all of the evidence, including the objective medical record, and determine whether Campbell has met her burden of proving that she suffers from an underlying impairment which is reasonably expected to produce her claimed symptoms alleged. Craig v. Chater, 76 F.3d 585, 592–93 (4th Cir. 1996). This assessment requires the ALJ to evaluate the intensity and persistence of Campbell's claimed symptoms and the affect those disabling conditions have on Campbell's ability to work. Id. at 594–95. A reviewing court gives great weight to the ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. See Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight).

Campbell takes issue with the ALJ's use of boilerplate language. Recent cases from districts in the Fourth Circuit have recognized that the use of such boilerplate language is

15

acceptable "where the ALJ explains his conclusions adequately." Jones v. Colvin, 5:12-CV-00567-FL, 2013 WL 5460197, at *15 (E.D.N.C. Sept. 30, 2013); see also Mascio v. Colvin, No. 2:11–CV–65–FL, 2013 WL 3321577, at *3 (E.D.N.C. July 1, 2013). "Inclusion of what was in effect credibility boilerplate in an otherwise valid decision does not render the decision in [a]… case fatally defective." Martin v. Colvin, 5:12CV00066, 2013 WL 4451230, at *7 (W.D. Va. Aug. 16, 2013).

Campbell's complaint that the ALJ's analysis was "less than elegant" and warrants remand is unavailing. Pl.'s Br. Summ. J. 9. It is apparent from her decision that the ALJ reviewed with some detail the medical record regarding Campbell's physical impairments, and measured her credibility against the objective medical evidence. R. 17–19. The ALJ explained that the medical record did not support the presence of symptoms as severe as Campbell alleged, particularly with regard to her complaints of frequent numbness and constant bruising and swelling in her back. R. 19. This conclusion is well supported by the record. Although Campbell stated that she experienced numbness and pain down her legs, physical examinations by Mr. Perkins often found negative straight leg raise tests and good strength in her legs (R. 283, 286, 288, 292, 294) and an x-ray and MRI from October 2009 failed to show significant problems. R. 204, 305. Campbell does not identify any treatment record which documents complaints about leg numbness. With regard to Campbell's testimony about constant bruising on her back caused by extended standing, records from Mr. Perkins suggest tenderness in his back (R. 286, 288, 294, 314) but not the prolific and persistent bruising and swelling that Campbell testified to at the administrative hearing. This suggests that while Campbell experienced some symptoms, they may not have been as severe as she alleges.

Moreover, as discussed in the previous section, Campbell worked for months past her alleged disability onset date and engaged in a range of physical daily activities. The acceptable

16

medical source opinions from state agency doctors determined that Campbell could perform a range of sedentary work. The evidentiary inconsistencies between Campbell's statements about her symptoms and the medical record, as well as Campbell's continued ability to work and perform various daily activities is sufficient support for the ALJ's finding that Campbell was only partially credible.

While the ALJ used standard language in her analysis of Campbell's credibility, that language does not render invalid an otherwise valid analysis because the ALJ provides adequate reasoning of her decision. Where substantial evidence supports the ALJ's credibility analysis, and the ALJ adequately explains his conclusion, the ALJ's decision must be affirmed. The ALJ did not find that Campbell was free from pain or significant impairments. To the contrary, the ALJ found that Campbell suffered from a number of severe physical impairments (R. 14–15) and found that she was limited to a range of sedentary work, the lowest exertional level, with a number of other restrictions. R. 16–17. The ALJ found Campbell's complaints of completely disabling symptoms partially credible because of conflicts between her statements and the medical record. I find that ample evidence supports this credibility analysis, and because the issue of credibility is entrusted to the ALJ, I decline to disturb her decision on this ground.

## CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The Clerk is directed to transmit the record in this case to Norman K. Moon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any

objections to this Report and Recommendation within fourteen (14) days hereof.  Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties.  Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objection.

> Enter:  July 28, 2014
>
> *Robert S. Ballou*
>
> Robert S. Ballou
> United States Magistrate Judge